**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| *ex rel.*  JANE DOE | ) | Case No. : |
| | ) | **FILED UNDER SEAL** |
| Plaintiffs | ) | Pursuant to 31 U.S.C. § 3730 |
| | ) | (False Claims Act) |
| vs. | ) | |
| | ) | |
| UNDER SEAL | ) | JURY DEMAND |
| | ) | |
| Defendants. | ) | |
| | ) | |

<u>**COMPLAINT**</u>

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| UNITED STATES OF AMERICA | )<br>)<br>) |
| *ex rel.* DOROTHY S. THOMAS | )<br>) Case No. : |
| Plaintiffs | ) **FILED UNDER SEAL**<br>) Pursuant to 31 U.S.C. § 3730<br>) (False Claims Act) |
| vs. | )<br>) |
| EDUCATION AFFILIATES,<br>INCORPORATED | )<br>)<br>) |
| and | )<br>) JURY DEMAND |
| JLL PARTNERS | )<br>) |
| Defendants. | )<br>) |

## <u>COMPLAINT</u>

Relator/Plaintiff Dorothy S. Thomas, by and through her attorneys, brings this False Claims Act ("FCA") Complaint, on behalf of the United States of America, against Defendants Education Affiliates, Inc., ("EA") and JLL Partners  (collectively, "Defendants").  Defendants are for-profit educational institutions that collect, on behalf of their students, federal financial aid monies to pay for their students' enrolled classes with Defendants' institutions of learning. Defendants have conducted business in the Middle District of Tennessee and/or have numerous students enrolled in classes both online and in-person who reside in the Middle District of Tennessee.

# I.    NATURE OF THE CASE

1.    This is an action to recover damages and civil penalties on behalf of the United States of America arising out of false claims approved and presented by Defendants to obtain millions of dollars annually from the United States Department of Education ("ED") pursuant to the Higher Education Act, Title IV ("HEA").  Defendants are among the largest recipients of HEA federal student financial aid funds from ED.  Ms. Thomas contends that Defendants, Education Affiliates and JLL Partners, have defrauded the United States and the United States Department of Education by knowingly and fraudulently:  (1) acquiring and retaining Title IV federal student financial aid funding it knew it was not entitled to for the purposes of maximizing company profits; and (2) certifying to the Secretary of Education that all applicable regulations had been adhered to.  The Defendants perpetrated this fraud by violating Department regulations in the following, non exclusive ways:

   1)    The Defendants intentionally altered attendance records within student files and accounts in order to retain Title IV funds that should have been returned to the government;

   2)    The Defendants intentionally failed to remove students from enrollment who had graduated from degree or certificate programs in order to retain Title IV funds that should have been returned to the government;

   3)    The Defendants intentionally altered and failed to acquire necessary admission documents from students in order to acquire Title IV funds they were not entitled to;

   4)    The Defendants, upon notification of Federal Student Aid ("FSA") compliance audits, intentionally altered the attendance, graduation, and admission records in

student files selected for audit in order to retain Title IV funding that should have

been returned to the government;

5)      The Defendants, upon receiving results of the FSA compliance audits which

identified money to be returned to the government,  failed to return the Title IV

funds identified by the FSA audit in order to retain Title IV funds that should

have been returned to the government;

6)      The Defendants misrepresented to students the scope and requirements of various

degree and certificate programs in order to boost enrollment and increase the

amount of Title IV funding received which Defendants were not entitled to; and

7)      The Defendants, in the few instances they returned funding  to the government,

often did so beyond the statutory deadline in order to retain and profit from Title

IV funds.

2.      All such certifications are core prerequisites to eligibility for the receipt of Title

IV funds and a condition of payment to receive ED funding.  At the time of certification each

year, Defendants are in knowing violation of these and other HEA requirements.

3.      Defendants had, and continue to have, actual knowledge that they are not

adhering to ED's requirements, that their certifications of compliance were and are false, and

that they, therefore, were and are submitting false or fraudulent claims to the United States.

Alternatively, Defendants acted and continue to act with deliberate indifference and/or reckless

disregard as to the truth or falsity of their claims.  Relator/Plaintiff asserts causes of action under

the False Claims Act for submission of knowingly false and fraudulent claims for payment or

approval, and knowingly making, using, or causing to be made or used, false records or

statements to get a false or fraudulent claim paid or approved, in violation of 31 U.S.C. §
3729(a)(1)(A),(B), (C), and (G).

## II.    JURISDICTION AND VENUE

4.    This is an action brought pursuant to the False Claims Act, 31 U.S.C. § 3729, *et
seq.*, and subject matter jurisdiction is invoked pursuant to 28 U.S.C. § 1331.  This case arises
from the wrongful conduct of the Defendants incident to obtaining funds from the ED pursuant
to the HEA.

5.    This Court has *in personam* jurisdiction over the Defendants under 31 U.S.C. §
3732(a), which authorizes nationwide service of process.

6.    31 U.S.C. § 3732(a) provides that "[a]ny action under section 3730 may be
brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any
one Defendant can be found, resides, transacts business, or in which any act proscribed by
section 3729 occurred."

7.    Venue is proper in the Middle District of Tennessee because at least one
Defendant conducts business in the Middle District of Tennessee and has numerous students
enrolled in classes both online and in-person who reside in the Middle District of Tennessee.

## III.    PARTIES

8.    Relator/Plaintiff Dorothy S. Thomas ("Thomas" or "Relator/Plaintiff") is a citizen
of the United States of America and is a resident of the State of Delaware.  Relator/Plaintiff has
spent more than twenty-five years working in the federal financial aid industry with public
community colleges and non-profit universities.  Relator/Plaintiff began working for Defendant
EA at the inception of the company in 2005, and in fact was the first employee hired by the
newly formed company.  Relator/Plaintiff was promoted at various different times during her

employment with Defendant EA.  At the time of her termination in March of 2012,

Relator/Plaintiff had risen to the position of Regional Director of Student Assistance and was

considered the Senior Regional Director for the Company.  Relator/Plaintiff reported directly to

the Vice President of Finance, Frederick E. Wilson.  Relator/Plaintiff's job responsibilities at that

time included:  maintaining full compliance with all the student financial assistance laws,

regulations and requirements of the US Department of Education, Veterans Administration,

Social Security Administration, and state departments of education, loan guarantee agencies,

vocational rehabilitation agencies and lenders; implementing strategies to ensure each school

makes full use of all the public and private financial assistance resources, which are generally

available to students in postsecondary educational institutions; monitoring cash flow from all

sources and implementing corrective strategies in conjunction with the School Director/

President to ensure the achievement of maximum profits; assisting the Financial Aid Director of

individual campuses to identify areas of improvement or improper use of the "Campus Vue" /

Campus Management system and developing an improvement plan, including the use of internal

or external resources needed to achieve maximum efficiency; and insuring all Financial

Assistance personnel are properly trained and maintain proficiency in the administration of Title

IV & state grant funds in a manner that will enhance the school's cash flow while maximizing

the student's eligibility without compromising compliance.  In this role, she gained an intimate

knowledge of EA's policies with respect to loans, federal financial aid funds, and students'

financial accounts.

　　　9.　　Plaintiff, the United States of America, through the ED, promotes student

achievement and preparation for global competitiveness by fostering academic excellence and

ensuring equal access to educational opportunity.  The ED also establishes policies related to

federal education funding and the distribution of federal funds, monitors the use of these funds, and enforces federal laws prohibiting discrimination in federally funded programs.

10.     Defendant EA is a Maryland corporation with its principal place of business at 5026-D Campbell Boulevard, Baltimore, Maryland, 21236.  EA was and/or is continuing to file and falsely certify documents to the ED.  EA is one of the largest providers of private post-secondary education in North America, based on student enrollment and revenue, with over fifty locations in the United States.  EA employs over one thousand faculty and staff and serves well over 60,000 students.  Through its online program and brick and mortar campuses, EA offers certificate and diploma programs, and undergraduate associate degree programs.  Defendant EA, as a parent company to the academic institutions, creates, manages and directs all of its institutions in creating the financial aid and corresponding policies as well as the direct EFT disbursement and retention of federal funds.

11.     Defendant JLL Partners, is a New York Corporation with its principal place of business at 450 Lexington Avenue, 31st Floor, New York, New York, 10017.  JLL Partners is a private equity investment firm which is the sole owner of Defendant EA.  JLL Partners is actively involved with the management of EA.  Defendant JLL Partners, as a parent company to EA and the academic institutions, assisted in creating, managing and directing the financial aid and corresponding policies for use at all of its subsidiary institutions.

### IV.     FACTS

**False Claims Act**

12.     The False Claims Act ("FCA") provides that any person who causes a false claim to be submitted to the Government is liable for a civil penalty of between $5,500 and $11,000 per claim plus three times the amount of damages the Government sustained.  31 U.S.C. §

3729(a); 28 C.F.R. § 85.3.  For purposes of the FCA, "the terms 'knowing' and 'knowingly' mean a person . . . (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C.  § 3729(b).  "[N]o proof of specific intent to defraud" is required for a successful claim under the FCA.  *Id.*

**Department of Education Regulations and Defendants' Certifications**

13.    As a general matter, the ED regulates educational institutions that participate in any student financial assistance programs authorized by Title IV of the HEA.  Title IV includes several federally-funded programs, including the Pell-Grant program, Federal Stafford Loans, and Federal Perkins Loans, among others.

14.    In order for a student to receive federal grants and/or federally-backed loans, the student must attend a school that is eligible to participate in the Title IV, HEA programs.

15.    Defendants sought and obtained eligibility to participate in Title IV, HEA programs as proprietary institutions of higher education.  Defendants, therefore, are required to comply with a number of federal regulations.

16.    In order for a school to obtain eligibility to participate in Title IV, HEA programs, the school must first enter into a Program Participation Agreement ("PPA") with the Secretary of Education.  This is a contract in which the school agrees that by participating in the Federal Student Aid programs, the school is bound by the requirements of those programs as conditions of payment for receiving federal funds.  Additionally, the participating school agrees to "comply with the program statutes, regulations, and policies governing the [Federal Student Aid]

programs" as set forth in 34 C.F.R. § 600 and for each Title IV, HEA program in which it participates, as well as the Student Assistance General Provisions regulations set forth in 34 C.F.R. § 668." *See* The Program Participation Agreement, *in* Blue Book, Dep't of Educ. (Oct. 2005).

17.    Defendants signed numerous PPAs with the ED from at least 2005 through the present, and certified in each PPA to comply with all program statutes and regulations and, specifically, to comply with certain enumerated provisions as conditions of payment of federal funds.

**The Scope of the Higher Education Act Covers Defendants' Actions**

18.    Section 668 of the Code of Federal Regulations "appl[ies] to an[y] institution that participates in any student financial assistance program authorized by Title IV of the [HEA] of 1965." 34 C.F.R. § 668.1(a). These financial assistance programs include, among others, the Federal Pell Grant Program; the Federal Stafford Loan Program; the Federal PLUS Program; the Federal Consolidation Loan Program; the Federal Work–Study Program; the William D. Ford Federal Direct Loan Program; and the Federal Perkins Loan Program. *Id.* § 668.1(c)(1)-(12).

19.    As a proprietary institution of higher education, as that term is defined in 34 C.F.R. § 600.5, private, for-profit schools that receive any federal assistance on behalf of their students must adhere to the regulations set forth in Title IV of the HEA with regard to the handling of those funds. 34 C.F.R. § 688.1.

20.    Therefore, Defendants, as proprietary institutions of higher education, must adhere to the regulations set forth in Title IV of the HEA with regard to the handling of federal assistance received on behalf of their students.

**Eligibility Requirements to Participate in HEA Programs**

21.    The ED sets forth formal requirements a school must meet in order to receive and be eligible to receive student financial assistance under the HEA, which includes certifying that the school will comply with certain regulatory requirements.  Specifically, the school must first qualify as an eligible institution under 34 C.F.R. § 600.  Second, the school must meet the standards set forth in 34 C.F.R. § 668, subpart L.  And third, the school must satisfy the requirements of 34 C.F.R. § 668.13(a)(2).

22.    34 C.F.R. § 600.5(a) defines a proprietary institution of higher education as one that is not a public or private nonprofit educational institution, has its location in at least one state, and admits only persons who have a high school diploma or an equivalent.  Moreover, proprietary institutions of higher education must be legally authorized to provide an educational program beyond secondary education in the state in which the institution is physically located, must provide an eligible program of training to prepare students for gainful employment in a recognized occupation, must be accredited, and must have been in existence for at least two years.  *Id.*

## DEFENDANTS' FRAUDULENT SCHEMES

23.    Defendants fraudulently and falsely certified their compliance with the terms and conditions for receiving federal financial aid on behalf of their students, which included, among other requirements that all unearned financial aid must be returned to the government upon the withdrawal of a student.  Instead of complying with the terms of their PPAs, Defendants concocted a scheme by which they intentionally and fraudulently failed to withdraw students' enrollments by altering or destroying records until such a time during each school term that Defendants were no longer required to return the funds – approximately 60% of the payment period or period of enrollment.  Defendants engage in this common practice with respect to

students, at any of Defendants' specific institutions, who explicitly withdraw, never attend class at all, or fail to attend the requisite number of classes.  This regular scheme violates numerous certifications made under the PPAs as conditions of payment of federal funds and results in a vast number of FCA violations by Defendants each year.

24.    Specifically, Defendants had a corporate directive, including a PowerPoint presentation that was distributed to all 53 of its subsidiary institutions which directed those institutions to shred verification of attendance records or "sign-in" sheets.  This was done in order to destroy evidence students had withdrawn from the various institutions in order to ensure Defendants could retain Title IV funds that should have been returned.  Relator/Plaintiff has first-hand knowledge of this practice, has seen the PowerPoint presentation, and has been physically present on various campuses where she requested to view verification of attendance records and was told none exist.

25.    Additionally, in addition to shredding documentation, Defendants directed the 53 subsidiary institutions to alter dates of last attendance and dates of determination in order to retain Title IV funds that should have been returned to ED.  These dates were altered and input into the Campus Vue system and two third party systems (Global and Fame) in order to reflect attendance of students to classes that were never in session and/or the campus was otherwise closed for holidays or student recess.  For example, Relator/Plaintiff personally reviewed, as part of an audit at the Fortis Dothan, AL campus, college catalogues that revealed that students were being counted as attending classes on holidays and other dates in which the campus was formally closed.

26.    Defendants fraudulently and falsely certified their compliance with the terms and conditions of receiving federal financial aid on behalf of their students, which included, among

other requirements, that all unearned financial aid be returned to the government upon the discovery that a student, although enrolled, either never attended the class or failed to attend the class enough times for all funds to be retained by the Defendants.  Instead of complying with the terms of their PPAs, Defendants intentionally and falsely treated these students as if they were enrolled in classes, after they had actually withdrawn, so Defendants could fraudulently capture federal funding designated to the students for their enrollment.  In many cases, students who had clearly withdrawn from their classes were actually enrolled by Defendants in subsequent classes, despite the fact that these students had received failing grades in their initial class for lack of attendance. This practice fraudulently and exponentially increased the amount of aid provided by and ultimately pilfered from the United States.

27.     Defendants further fraudulently and falsely certified their compliance with the terms and conditions of receiving federal financial aid on behalf of their students, which included, among other requirements, that all unearned financial aid be returned to the government upon the graduation or a student's completion of a certificate or degree program. Instead of complying with the terms of their PPAs, Defendants intentionally and falsely treated these students as if they were enrolled in classes, after they had actually completed their degree or certificate program, so Defendants could fraudulently capture federal funding designated to the students for their enrollment.  This practice fraudulently increased the amount of federal financial aid received by Defendants and violates certifications of compliance made by Defendants and therefore violates the FCA.

28.     Defendants further fraudulently and falsely certified their compliance with the terms and conditions of receiving federal financial aid on behalf of their students, which included, among other requirements, that all students enrolled in Defendants' institutions meet

federal admission and other initial qualifying requirements to receive federal financial aid.

Instead of complying with the terms of their PPAs, Defendants intentionally and falsely altered

admission documents or enrolled students in degree or certificate programs that did not have

appropriate admission qualifications to receive such aid, so that Defendants could fraudulently

capture federal funding designated to the students for their enrollment.  This practice

fraudulently increased the amount of federal financial aid received by Defendants and violates

certifications of compliance made by Defendants and therefore violates the FCA.

29.    During her tenure, Relator/Plaintiff was aware Defendants encouraged students

who did not have an accredited high school diploma or GED, to acquire a fake diploma from the

internet with no substance, accreditation, etc. to appear as if they were eligible to attend, and

therefore the school could receive Title IV funds on that student's behalf.  Relator/Plaintiff

personally viewed student files as part of numerous audits she conducted as part of her job duties

in which she discovered fraudulent or "buy" diplomas.

30.    Defendants further fraudulently and falsely certified their compliance with the

terms and conditions of receiving federal financial aid on behalf of their students, which

included, among other requirements, that Defendants comply with the Department of

Education's annual FSA compliance audit program.  Instead of complying with the terms of their

PPAs, Defendants intentionally and falsely altered documents regarding attendance, admission,

among others in files selected for audit in order to prevent discovery of federal funds that should

never have been received and therefore returned to the government.  Defendants also schemed to

self-select files for inclusion in the audit in order to prevent the government from discovering

their widespread scheme to capture ineligible Title IV federal funding.

31.    Defendants further fraudulently and falsely certified their compliance with the terms and conditions of receiving federal financial aid on behalf of their students, which included, among other requirements, that Defendants accurately represent the nature of their academic and financial programs to their students and to state agencies.  Defendants violated their PPAs when they intentionally misrepresented the nature of their academic programs to their students by instituting upper-level courses as beginner-level courses with no prerequisites in an attempt to increase enrollment and capture more financial aid.  By doing so, Defendants misled students into taking more difficult, higher-level classes, knowing many students would be forced to drop out, and then pocketed the financial aid for these students.

32.    Defendants further violated their PPAs by intentionally misrepresenting the nature of their financial programs.  Defendants intentionally misrepresented that financial aid returns were driven by actual attendance and actual enrollment of illegible students such that when a student was no longer considered to be in attendance or discovered was ineligible for admission, the Defendants would return their unearned financial aid to the government.  Instead, Defendants ignored their own policies, as well as those enumerated in Title IV, HEA regulations, and maintained student enrollment in an attempt to capture more financial aid.

33.    Defendants fraudulently and falsely certified their compliance with the terms and conditions of receiving federal financial aid on behalf of their students, which included, among other requirements, that Defendants be fiscally responsible.  The Defendants violated their PPAs when they intentionally failed to follow their own written financial aid policies, and return unearned financial aid to the government, rendering them fiscally irresponsible.

34.    Importantly, Defendants are the parent companies to the approximately 53 academic institutions that they oversee and run.  Although they are separate corporate

institutions, each of Defendants' financial aid and corresponding policies are structured and modeled after each other and these policies all have their common origin with the Defendants. These common policies, as created by EA and JLL Partners, have resulted in the submission of the false claims as detailed herein.

35.    These violations by Defendants are violations of conditions of payment of receiving federal education funds.  Relator/Plaintiff has first-hand knowledge that these policies have been in place since EA's inception in 2005 and upon information and belief are ongoing through the present day at all of Defendants' institutions.

**Defendants Violated the Terms of Their Program Participation Agreements, and Falsely Certified Compliance With The Program Participation Agreements**

36.    In order to participate in any Title IV, HEA program and receive federal funding for its students, a school must "enter[] into a written program participation agreement," ("PPA") which "conditions the initial and continued participation of an eligible institution in any Title IV, HEA program upon compliance with the provisions of [federal law], the individual program regulations, and any additional conditions specified in the program participation agreement that the [ED] requires the institution to meet."  34 C.F.R. § 668.14(a)(1)

37.    Moreover, each institution's PPA applies to each branch campus and other location of the institution that meets the requirements of the HEA.  *Id.* § 668.14(a)(2). Specifically, by entering into a PPA, an institution certifies, among other things, that it " . . . will comply with all statutory provisions of or applicable to Title IV of the HEA, all applicable regulatory provisions prescribed under that statutory authority, and all applicable special arrangements, agreements, and limitations entered into under the authority of statutes applicable to Title IV of the HEA, including the requirement that the institution will use funds it receives

under any Title IV, HEA program and any interest or other earnings thereon, solely for the purposes specified in and in accordance with that program. *Id.* § 668.14(b)(1).

38.    Defendants certified they would "…establish and maintain such administrative and fiscal procedures and records as may be necessary to ensure proper and efficient administration of funds received from the Secretary or from students under the Title IV, HEA programs. *Id.* § 668.14(b)(4). Further, they would "comply with the provisions…relating to factors of financial responsibility," and they would "comply with the requirements of § 668.22 [instructions on returning federal aid to the Government for students who withdraw from an institution]. *Id.* § 668.14(b)(5), (24).

39.    Moreover, Defendants specifically certified they would be liable for all **"…improperly spent or unspent funds received under the Title IV, HEA programs**, including any funds administered by a third-party servicer; and…**[for] [r]eturns of title IV, HEA program funds that the institution or its servicer may be required to make." *Id.* § 668.14(b)(25) (emphasis added).**

40.    In sum, as a pre-requisite to receiving any federal financial aid for their students, schools, including Defendants, must certify that they will comply with all applicable laws under Title IV of the HEA, all applicable regulations and statutes under the Act, that they will maintain proper and compliant administrative and fiscal procedures with regard to the funds, that they will be financially responsible as discussed fully below, that they will return all unused federal aid for students who withdraw from their courses of study, and that they will be liable for any breaches of these duties and responsibilities. *Id.* § 668.14(b)(1)-(25).

**Defendants' Improper Treatment of HEA Funds When a Student Withdraws from a Class in Violation of Certified Conditions of Payment**

41.     When a recipient of a Title IV grant or loan withdraws from an institution during the period of enrollment in which the recipient began attendance, "the institution must determine the amount of Title IV grant or loan assistance that the student earned as of the student's withdrawal date" and return the rest.  34 C.F.R. § 668.22(a).  In order to do this, schools must first calculate the date of student withdrawal and, on a semi-prorated basis, return the amount of unused aid that the Government provided the school on behalf of the student.  34 C.F.R. § 668.22(c).

42.     For institutions that are not required to take attendance, a student's withdrawal date is calculated in a few different ways, including: 1) the date, as determined by the institution, that the student began the withdrawal process; 2) the date, as determined by the institution, that the student otherwise provided official notification to the institution, in writing or orally, of his or her intent to withdraw; 3) if the student stops attending without providing official notification to the institution of his or her withdrawal, the mid-point of the payment period (or period of enrollment, if applicable); 4) if the institution determines that a student did not begin the institution's withdrawal process or otherwise provide official notification (including notice from an individual acting on the student's behalf) to the institution of his or her intent to withdraw because of illness, accident, grievous personal loss, or other such circumstances beyond the student's control, the date that the institution determines is related to that circumstance; 5) if a student does not return from an approved leave of absence, the date that the institution determines the student began the leave of absence; or 6) if a student takes an unapproved leave of absence, the date that the student began the leave of absence.  34 C.F.R. § 668.22(c)(1)(i)-(vi).

43.     Additionally, "if a student ceases attendance (drops or withdraws) from all his or her Title IV eligible courses in a payment period or period of enrollment, the student must be

considered a withdrawal for Title IV purposes." *See* Withdrawals and the Return of Title IV

Funds 5-4, *in* Federal Student Aid Handbook, Dep't of Educ. (2012) ("2012 FSAH").

44.     In sum, the requirements for withdrawing a student from an institution, no matter

how that student withdraws, demand that the school must immediately withdraw him or her,

calculate the amount of unearned aid distributed to the institution on the student's behalf, and

return that aid to the Government. *Id.* Further, an institution must document a student's

withdrawal date and maintain the documentation as of the date of the institution's determination

that the student withdrew. *Id.* Moreover, an institution must make it easy for a student to

withdraw, by designating one or more offices at the institution that a student may readily contact

to provide official notification of withdrawal. *Id.* § 688.22(c)(5)(i)-(ii).

45.     After calculating the amount of federal assistance earned by the student, an

institution must determine the percentage of the total aid that the earned amount comprises of the

student's total aid and return the rest. *Id.* § 668.22(a)(4)(i).

46.     The percentage of Title IV grants or loan assistance that has been earned by the

student is "equal to the percentage of the payment period or period of enrollment that the student

completed . . . as of the student's withdrawal date, if this date occurs on or before…[c]ompletion

of 60 percent of the payment period or period of enrollment for a program that is measured in

credit hours…or [s]ixty percent of the clock hours scheduled to be completed for the payment

period or period of enrollment for a program that is measured in clock hours." *Id.* §

668.22(e)(2)(i)

47.     The total amount of unearned Title IV assistance to be returned is calculated by

subtracting the amount of Title IV assistance earned by the student as calculated under 34 C.F.R.

§ 668.22(e) from the amount of Title IV aid that was disbursed to the student as of the date of the institution's determination that the student withdrew.

48.     The institution ***must*** return, the lesser of: 1) the total amount of unearned Title IV assistance to be returned, or 2) an amount equal to the total institutional charges incurred by the student for the payment period or period of enrollment multiplied by the percentage of Title IV grant or loan assistance that has not been earned by the student.  *Id.* § 668.22(g)(1)(i)-(ii).

49.     Further, the school must return the amount of Title IV funds due the Government "as soon as possible, but no later than 45 days after the date of the institution's determination that the student withdrew."  *Id.* § 668.22(a)(6)(ii)(B)(1).

50.     For schools that are not required to take attendance, the institutions must develop a mechanism for determining whether a student who began attendance and received or could have received an initial disbursement of Title IV funds unofficially withdrew (ceased attendance without providing official notification or expressed intent to withdraw) during a payment period or period of enrollment.  *See* 2012 FSAH, at 5-56 (citing 34 C.F.R § 668.22(j)(2)).  The institution must make that determination as soon as possible, but no later than 30 days after the end of the earlier of: the payment period or period of enrollment, as applicable; the academic year; or the program.  *Id.*  If a student begins attendance, has not officially withdrawn, but fails to earn a passing grade in at least one of their classes, the institution must assume, for Title IV purposes that the student has unofficially withdrawn, unless the institution can document that the student completed the period**.**  *Id.*  Thus, under these circumstances, the burden is on the institution to prove that it should have maintained the funds.  *Id.*

51.     In order to be considered attending or engaging in an academically related activity, students must meet certain criteria that the school, in turn, must certify that it monitors.

"Academic attendance" and "attendance at an academically-related activity," includes, but is not limited to: 1) physically attending a class where there is an opportunity for direct interaction between the instructor and students; 2) submitting an academic assignment; 3) taking an exam, an interactive tutorial, or computer-assisted instruction; 4) attending a study group that is assigned by the institution; 5) participating in an online discussion about academic matters; and 6) initiating contact with a faculty member to ask a question about the academic subject studied in the course.  *Id.* § 668.22(l)(7)(i)(A)(1)-(6).

## SPECIFIC INSTANCES OF FALSE CLAIMS ACT VIOLATIONS

52.    Defendants purposely failed to properly withdraw students who either notified agents of Defendants' academic institutions that they wanted to withdraw or had administratively withdrawn from the courses and/or school in which they were enrolled.

53.    Additionally, Defendants knew which of their students should have been withdrawn according to both federal regulations and school policies.  Relator/Plaintiff, on behalf of EA conducted numerous audits of nearly all 53 campuses that EA ran and compiled spreadsheets of students that had withdrawn or otherwise required EA refunding money to the government.  EA was, therefore, on notice as to which students should have been academically withdrawn, but continued to enroll them in classes and fail them instead of withdrawing them, as a part of their scheme to collect federal monies in violation of their PPAs.  In fact, some students were even later enrolled in additional classes in subsequent terms instead of being immediately withdrawn.

**Defendants Failed to Return Funds at EA's Fortis Landover, MD Campus**

54.    Relator/Plaintiff, as part of her job duties, conducted an audit of Defendant's Fortis Landover, MD campus.  The results of this limited audit revealed 56 student files required

EA to return at least a portion and in many instances the entire amount, of federal funding received under Title IV programs.  The audit conducted was only for the 2010/2011 academic year and because of resource and manpower reasons, only involved a small sample size of student files at the Landover campus.  EA knowingly failed to refund money to the Department of Education on substantially more student files for this academic year as well as all other academic years since EA's inception in 2005, at all of EA's 53 campuses nationwide.

55.    EA, upon receiving the results of Relator/Plaintiff's audits took steps to avoid returning any federal funds by fraudulently withholding information from the government, changing student records, or simply refusing to refund the required money.

56.    Of the 56 student files mentioned in paragraph 54, 6 students had graduated from their respective programs at some point during the academic year while EA received and retained federal education program funding for these students as if they were enrolled and continued attending classes; 22 students dropped out of the program entirely and otherwise never attended classes despite EA receiving and retaining federal education program funding for these students as if they were enrolled and continued attending classes; and the remaining 20 students identified in Relator/Plaintiff's audit did not qualify for federal funding during the 2010/2011 academic year for various reasons, despite EA receiving and retaining federal education funding for these students for the entire academic year.

57.    Relator/Plaintiff was in constant contact with upper management at EA, including but not limited to Duncan Anderson, Jerry Smith and Frederick Wilson, regarding the results of her findings.  Defendants reacted to the results of Relator/Plaintiff's audits with near universal hostility and attempted to minimize the results by either blatantly changing the results, doctoring

actual documents in student files, or simply refusing to return and refund funding to the Department of Education.

58.     Of the 56 identified student files in Relator/Plaintiff's Audit of EA's Landover campus, EA took no action to return any money for any of the 56 student files.

59.     The actions, or failure to act, by Defendants as it relates to this particular audit are part of the Defendants' nationwide corporate scheme to defraud Title IV education funding from 2005 to present.

**Defendants Failed to Return Funds at EA's Fortis Essington, PA Campus**

60.     Relator/Plaintiff, as part of her job duties, conducted an audit of Defendant's Fortis Essington, PA campus.  The results of this limited audit revealed that of 266 student files reviewed, 30 of them required EA to return at least a portion and in many instances, the entire amount of federal funding received under Title IV programs.  The audit conducted was only for the 2010/2011 academic year and because of resource and manpower reasons, only involved a small sample size of student files (266) at the Essington campus.  EA knowingly failed to refund money to the Department of Education on substantially more student files for this academic year as well as all other academic years since EA's inception in 2005, at all of EA's 53 campuses nationwide.

61.     Of the 30 student files identified in Relator/Plaintiff's audit and referenced in paragraph 60, 11 students had graduated from their respective programs at some point during the academic year while EA received and retained federal education program funding for these students as if they were enrolled and continued attending classes; 16 students dropped out of the program entirely and otherwise never attended classes despite EA receiving and retaining federal education program funding for these students as if they were enrolled and continued attending

classes; and the remaining 3 students identified in Relator/Plaintiff's audit did not qualify for federal funding during the 2010/2011 academic year for various reasons, despite EA receiving and retaining federal education funding for these students for the entire academic year.

62.     EA, upon receiving the results of Relator/Plaintiff's audits took steps to avoid returning any federal funds by fraudulently withholding information from the government, changing student records, or simply refusing to refund the required money.

63.     Based on Relator/Plaintiff's findings in her very limited audit of the 30 student files, EA was required to return $243,962.90 of Title IV funding to the Department of Education. EA took no action to return any federal funding associated with the 30 student accounts identified in this audit.

64.     Relator/Plaintiff was in constant contact with upper management at EA, including but not limited to Duncan Anderson, Jerry Smith and Frederick Wilson, regarding the results of her findings.  Defendants reacted to the results of Relator/Plaintiff's audits with near universal hostility and attempted at all costs to minimize the results thereof by blatantly changing the results, doctoring actual documents in student files, or simply refusing to return and refund funding to the Department of Education.

65.     The actions, or failure to act, by Defendants as it relates to this particular audit are part of the Defendants' nationwide corporate scheme to defraud Title IV education funding from 2005 to present.

**<u>Defendants Failed to Return Funds at EA's Fortis Lester, PA Campus</u>**

66.     Relator/Plaintiff, as part of her job duties, conducted an audit of Defendant's Fortis Lester, PA campus.  The results of this limited audit revealed that of 214 student accounts reviewed, that 33 of them required EA to return at least a portion and in many instances, the

entire amount of, federal funding received under Title IV programs.  The audit conducted was only for the 2010/2011 academic year and because of resource and manpower reasons, only involved a small sample size of student files (214) at the Lester campus.  EA knowingly failed to refund money to the Department of Education on substantially more student files for this academic year as well as all other academic years since EA's inception in 2005, at all of EA's 53 campuses nationwide.

67.     Of the 33 student accounts identified in Relator/Plaintiff's audit and referenced in paragraph 66, 23 students had graduated from their respective programs at some point during the academic year while EA received and retained federal education program funding for these students as if they were enrolled and continued attending classes; 7 students dropped out of the program entirely and otherwise never attended classes despite EA receiving and retaining federal education program funding for these students as if they were enrolled and continued attending classes; and the remaining 3 students identified in Relator/Plaintiff's audit did not qualify for federal funding during the 2010/2011 academic year for various reasons, despite EA receiving and retaining federal education funding for these students for the entire academic year.

68.     EA, upon receiving the results of Relator/Plaintiff's audits took steps to avoid returning any federal funds by fraudulently withholding information from the government, changing student records, or simply refusing to refund the required money.

69.     Based on Relator/Plaintiff's findings in her very limited audit of the 33 student files, EA was required to return $203,227.00 of Title IV funding to the Department of Education. EA took no action to return any federal funding associated with the 33 student accounts identified in this audit.

70.    Relator/Plaintiff was in constant contact with upper management at EA, including but not limited to Duncan Anderson, Jerry Smith and Frederick Wilson, regarding the results of her findings.  Defendants reacted to the results of Relator/Plaintiff's audits with near universal hostility and attempted at all costs to minimize the results thereof by blatantly changing the results, doctoring actual documents in student files, or simply refusing to return and refund funding to the Department of Education.

71.    The actions, or failure to act, by Defendants as it relates to this particular audit are part of the Defendants' nationwide corporate scheme to defraud Title IV education funding from 2005 to present.

**Defendants Do Not Meet the HEA's Criteria for Financial Responsibility**

72.    The ED requires that in order "[t]o begin and to continue to participate in any Title IV, HEA program, an institution must demonstrate . . . that the institution is financially responsible" and the institutions must meet certain specific criteria with regard to its fiscal responsibility.  34 C.F.R. § 668.15(a).  A financially responsible school, therefore, is one that provides the services described in its official publications and statements; and meets all of its financial obligations, including but not limited to 1) refunds that it is required to make; and 2) repayments to the Secretary for liabilities and debts incurred in programs administered by the Secretary. 34 C.F.R. § 668.15(b)(1)-(3).

73.    Thus, as a prerequisite to begin or to continue to receive federal financial aid on behalf of its students, a school must certify it is financially responsible, meaning that it, among other criteria, is currently providing the services described in its publications and is making all required refunds to the ED.  *Id.*

**Defendants Failed to Adequately Track HEA Standards for Academic Progress**

74.    Schools that wish to participate in any education federal grant or loan program are required to establish, publish, and apply reasonable standards for ensuring that their students are maintaining satisfactory academic progress.  34 C.F.R. § 668.16.  The standards are reasonable if (1) the policy is at least as strict as the policy the institution applies to a student who is not receiving assistance under the Title IV, HEA programs; (2) the policy provides for consistent application of standards to all students within categories of students (full time, part time, etc.) and educational programs established by the institution; (3) the policy provides that a student's academic progress is evaluated at the end of each payment period or at least annually to correspond with the end of a payment period.  *Id.* § 668.34.

75.    Moreover, in order to receive any federal grant or loan, a student must maintain satisfactory progress in his or her course of study according to the educational institution's published standards of progress.  *Id.* § 668.32.  Students' attendance records are reviewed by the school at the end of each year, and if the student maintains attendance or academic progress as determined by the institution, a student is deemed to be maintaining satisfactory progress.  20 U.S.C. § 1091.

76.    Defendants violated its PPA when it failed to adequately track HEA standards for academic progress.  As outlined in the paragraphs above, Defendants refused to withdraw students who never attended class or failed to comply with its attendance policy.  Furthermore, Defendants kept re-enrolling failing students in the same classes.  Defendants, therefore, knew its students were not attending, did not withdraw them, and continued to enroll them in successive courses, while continuing to receive financial aid for them and retaining funds that should have been returned to the Department of Education.  Through these actions, the

Defendants knowingly violated and continue to violate 34 C.F.R. § 668.16, their PPA

certifications, and therefore conditions of payment.

**<u>Defendants Substantially Misrepresent Their Institutions to Students</u>**

77.    Any institution participating in the Title IV, HEA programs is prohibited from

engaging in activities that constitute "substantial misrepresentations" regarding the institution.

34 C.F.R. § 668.71.  A "[s]ubstantial misrepresentation [is a]ny misrepresentation on which the

person to whom it was made could reasonably be expected to rely, or has reasonably relied, to

that person's detriment."[1]  *Id.*  This prohibition is extended to those substantial

misrepresentations concerning the nature of the institution's financial charges or its educational

program.  *Id.*  "Congress adopted this provision to protect students from 'false advertising' and

other forms of manipulative 'sharp practice.'"  *Ass'n of Private Sector Colleges & Univs. v.

Duncan*, 681 F.3d 427, 436 (D.C. Cir. 2012) (quoting H.R. Rep. No. 94-1086, at 13 (1976)).

78.    Misrepresentations pertaining to the nature of an institution's educational program

include false, erroneous or misleading statements about the nature or extent of any prerequisites

established for enrollment in any course.  *Id.* §§ 668.72.

79.    Misrepresentations relating to the nature of an institution's financial charges

include false, erroneous, or misleading statements concerning "the cost of the program and the

institution's refund policy if the student does not complete the program."  *Id.* § 668.73(c).

80.    A school is thus prohibited from making any false, erroneous, or misleading

statements regarding the institution's refund policy and/or the nature or extent of any

prerequisites established for enrollment in any course.  The Defendants made substantial

misrepresentations relating to the nature of their academic programs when they automatically

---

[1] While 34 C.F.R. §668.71 was rewritten in 2011, the definition of "substantial misrepresentation" was not changed.

enrolled beginner students in an upper-level course that was a core requirement for various programs at numerous campuses nationwide to encourage enrollment, but intentionally did not require any prerequisites.  Upon information and belief, these policies are duplicated in other academic areas of study as a means of fulfilling the general scheme of enrolling more students and acquiring more government aid by Defendants.

81.    Defendants also made substantial misrepresentations about the nature of its financial aid policy, specifically regarding their refund policy when a student does not complete a program.  The Defendants represented that they would comply with the terms of their PPAs and refund those students who officially or unofficially withdrew before 60% of the payment period or period of enrollment was completed.  However, as shown above, there are specific examples where Defendants purposely retained and continue to retain those students who violated attendance requirements rather than withdrawing them.  This was done in order to capture the students' Title IV funding and in violation of the certification of a condition of payment under the PPA; thus, triggering the FCA.

**Defendants Have Received and Continue to Receive Financial Aid As a Result of Their False Claims**

82.    Although Defendants certified compliance with their PPAs, they violated numerous conditions of payment through their actions described above.  Because of these violations, false certifications, and fraudulent claims, Defendants have received money and improperly retained funds that belong to the federal government.

**Defendants Retaliated Against Relator/Plaintiff**

83.    Relator/Plaintiff has over 24 years experience dealing with federal financial aid in higher education.  She very easily recognized the corporate practice of Defendants as it relates to Title IV funding was illegal and contrary to federal regulations.  As Defendant EA grew and

acquired more physical campuses and institutions since its inception in 2005, it was apparent to Relator/Plaintiff that federal financial aid regulations were blatantly being ignored and funding was not being refunded as required by federal regulations and law.

84. Relator/Plaintiff raised with upper management, specifically Frederick Wilson, Jerry Smith, Regional Vice Presidents Carl Spatocco, Jane Chadwick, Richard Zaiden, Glenn Tharp, Eric Jacobs, Sidney Carey, and Dianne McCrea, as well as internal auditors, corporate managers and other Regional Directors of Student Assistance on numerous occasions her concerns regarding the practices described in this complaint. As it became more and more apparent that Defendants had no intention to follow applicable financial aid regulations, the Relator/Plaintiff increased in frequency her complaints to her supervisor, Frederick Wilson and Jerry Smith, even to the CEO of EA, Duncan Anderson.

85. As a direct result of Relator/Plaintiff raising her concerns of the Defendants corporate practice regarding federal financial aid, she was terminated from her employment in March of 2012.

86. The Relator/Plaintiff engaged in protected conduct as defined by the Federal False Claims Act anti-retaliation provision. 31 U.S.C. § 3730(h). Relator/Plaintiff's acts of notifying upper management of the illegal retention of Title IV funds constitute an action in furtherance of this action, and terminating her employment on that basis violates the anti-retaliation provision of the Act.

## COUNT I
## FALSE CLAIMS ACT VIOLATION
(Violation of 31 U.S.C. § 3729(a)(1)(A))

87. Relator/Plaintiff incorporates by reference all preceding paragraphs.

88.     In performing the acts set out herein, Defendants defrauded the United States of America by knowingly presenting, or causing to be presented, to one or more officers, employees or agents of the United States of America, a false and fraudulent claim for payment or approval in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), to the damage of the treasury of the United States of America, by causing the United States to pay out money it was not obligated to pay.

89.     As set forth in the preceding paragraphs, Defendants knowingly violated 31 U.S.C. § 3729(a)(1)(A) and have damaged the United States by their actions in an amount to be determined at trial.

## COUNT II
## FALSE CLAIMS ACT VIOLATION
(Violation of 31 U.S.C. § 3729(a)(1)(B))

90.     Relator/Plaintiff incorporates by reference all preceding paragraphs.

91.     By virtue of the acts described above, Defendants have knowingly made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim paid or approved by the United States of America, in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), to the damage of the treasury of the United States of America, by causing it to pay out money it was not obligated to pay.

92.     As set forth in the preceding paragraphs, Defendants knowingly violated 31 U.S.C. § 3729(a)(1)(B) and have damaged the United States by their actions in an amount to be determined at trial.

## COUNT III
## FALSE CLAIMS ACT VIOLATION
(Violation of 31 U.S.C. § 3729(a)(1)(C))

93.     Relator/Plaintiff incorporates by reference all preceding paragraphs.

94.     Defendants each conspired to defraud the government, by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval, when the Defendant companies, acting in concert, deliberately misled the government as to whether students were attending classes and whether any federal financial aid funds were to be returned to the government as a result.

95.     Defendants knowingly made or caused to be made false records or statements to the ED in which Defendant companies certified or caused others to certify Defendant companies were acting in compliance with all pertinent laws and regulations, especially and including those laws and regulations central to the ED federal financial aid programs, the HEA, and Title IV, when in fact Defendant companies were deliberately misleading the government as to whether students were attending classes and whether any federal financial aid funds were to be returned to the government as a result.

96.     Defendants, by and through their officers, agents, and employees, authorized their various officers, agents, and employees to take the actions set forth above.

97.     As set forth in the preceding paragraphs, Defendants knowingly violated 31 U.S.C. § 3729(a)(1)(C) and have damaged the United States by their actions in an amount to be determined at trial.

## COUNT IV
## FALSE CLAIMS ACT VIOLATION
(Violation of 31 U.S.C. § 3729(a)(1)(G))

98.     Relator/Plaintiff incorporates by reference all preceding paragraphs.

99.     By virtue of the acts described above, Defendants have knowingly made, used or caused to be made or used, false records or statements material to an obligation to pay or

transmit money to the United States Government, and/or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the United States Government, in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G), to the damage of the treasury of the United States of America.  The United States Government is entitled to full recovery of the amount paid by these agencies, for the claims based upon false or fraudulent statements because but for the fraud perpetrated upon the government such payments would not have been retained.

100.     As set forth in the preceding paragraphs, Defendants knowingly violated 31 U.S.C. § 3729(a)(1)(G) and have damaged the United States by their actions in an amount to be determined at trial.

## COUNT V
## FALSE CLAIMS ACT VIOLATION
(Violation of 31 U.S.C. § 3730(h))

101.     Relator/Plaintiff incorporates by reference all preceding paragraphs.

102.     In retaliation for lawful acts done by Relator/Plaintiff in furtherance of an action under the False Claims Act and because of other efforts by her to stop one or more violations of the False Claims Act, the Defendants discharged or attempted to discharge, demoted, threatened, harassed and/or discriminated against Relator/Plaintiff as to the terms and conditions of her employment.

103.     Such conduct constitutes a violation of the False Claims Act, 31 U.S.C. § 3730(h).

## PRAYER FOR RELIEF

WHEREFORE, the Relator/Plaintiff Thomas on behalf of herself and the United States, prays:

A.     That this Court enter judgment under Counts I, II, III, and IV against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions in violation of 31 U.S.C. § 3729, *et seq.,* plus statutory penalties;

B.     That the Relator/Plaintiff be awarded all costs incurred, reasonable attorney's fees and expenses;

C.     That in the event the United States Government intervenes at the time the action is unsealed and proceeds with this action, the Relator/Plaintiff be awarded an amount of at least 15%, but not more than 25%, of the proceeds of this action or settlement of the claims in Counts I, II, III, and IV;

D.     That in the event the United States Government does not intervene as set forth above, the Relator/Plaintiff be awarded an amount of at least 25%, but not more than 30%, of the proceeds of this action or settlement of the claims in Counts I, II, III, and IV;

E.     That the United States Government and Relator/Plaintiff receive all relief, both at law and in equity, to which they are entitled; and,

F.     That Relator/Plaintiff be awarded all compensatory and punitive damages, including personal injury damages for pain and suffering and loss of reputation, back pay, and interest to which he is entitled pursuant to 31 U.S.C. § 3730(h); (b) That she be reinstated with the same seniority status that she would have had but for the retaliation and discrimination; (c) That she be awarded all litigation costs and reasonable attorneys fees pursuant to 31 U.S.C. § 3730(h); and (d)  That she

receive all relief, both in law and at equity, to which she may reasonably appear entitled.

G.     That a trial by jury be held on all issues.

Dated:  January 16, 2013                    Respectfully Submitted,


/s/ David W.Garrison_____
George E. Barrett
David W. Garrison
Scott P. Tift
Seth M. Hyatt
Barrett Johnston, LLC
217 Second Avenue North
Nashville, TN 37201
615-244-2202
gbarrett@barrettjohnston.com
dgarrison@barrettjohnston.com
stift@barrettjohnston.com
shyatt@barrettjohnston.com

Jamie M. Bennett, Esq.
Nathan M. Peak, Esq.
Ashcraft & Gerel, LLP
4301 Garden City Drive
Suite 301
Landover, MD 20785
301-459-8400
jbennett@ashcraftlaw.com
npeak@ashcraftlaw.com

*Counsel for Relator/Plaintiff Thomas*